[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13192
Non-Argument Calendar
_____

D.C. Docket No. 1:09-cv-00177-MP-GRJ

MARCUS ISOM,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(June 13, 2014)

Before TJOFLAT, HULL and MARCUS, Circuit Judges.

PER CURIAM:

Marcus Isom is a Florida prison inmate serving a life sentence for murder and thirty years for conspiracy to commit first-degree murder.[1]  He was convicted of these offenses in August 2002, following a jury trial.  After his convictions and sentences were affirmed on direct appeal, *Isom v. State*, 861 So.2d 27 (Fla. 1st DCA 2003) (Table), and the District Court of Appeal affirmed the trial court's denial of his post-conviction motion to set aside his convictions,[2] *Isom v. State*, 993 So.2d 967 (Fla. 1st DCA 2008) (Table), he petitioned the United States District Court for the Northern District of Florida for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The District Court denied his petition.  He appealed, and this court issued a certificate of appealability ("COA"), *see* 28 U.S.C. § 2253(c), on one issue:

> Whether the state court unreasonably applied clearly established federal law, as established by the Supreme Court, in determining that Isom failed to establish prejudice with regard to his claim that his trial counsel misadvised him concerning his right to testify.

We commence our discussion of this issue by summarizing the facts the evidence established at Isom's murder trial.  Then, after setting out the standards that govern our review of the state court's decision rejecting the claim stated in the COA, we determine whether the state court unreasonably applied clearly

---

[1]  Isom was convicted of these offenses in August 2002.  His sentences are concurrent.
[2]  *See* Fla. R. Crim. P. 3.850

2

established Supreme Court precedent as Isom contends.  At the end of the day, we conclude that the state court did not.

I.

The District Court, in denying habeas relief, adopted the Magistrate Judge's recitation of the facts established at Isom's trial.[3]

> In the early morning hours of December 9, 2001, Lemuel "Lem" Larkin was shot and killed outside a nightclub in Archer, Florida.  Larkin's girlfriend, Mary Edwards, testified that she was with Larkin at the time of his death.  Larkin went outside to go to the bathroom, she followed him, and as she was walking toward him saw a man with a gun run up to the building.  Edwards heard a gunshot and saw Larkin fall to the ground. Larkin died from a single gunshot wound to the head.  Edwards viewed two photo lineups but was unable to identify the shooter.  Another witness, Kevin Patterson, testified that he heard the gunshot and saw a man run from the rear of the building. Patterson viewed a photo lineup and identified Truth Miller as the man he saw running from the nightclub.  Another witness, Pamela Curtis, also heard the gunshot and saw a tall, slender, dark-skinned man running down the road.  Truth Miller was described by a key witness for the state as being tall, slender, and black.

> The state's key witness in the case was Victor Smith, who testified pursuant to an agreement with the state.  Smith testified that he was friends with Larkin, sold drugs for Petitioner, and was acquainted with Miller.  As part of his dealings with Petitioner, Smith held money for Petitioner–proceeds from drug sales.  In December 2001, Smith staged a break-in at his apartment to steal Petitioner's money, approximately $15,000. Smith had a friend take the money, reported a burglary to police, and told Petitioner that someone had stolen the $15,000.  Petitioner suggested that Smith go to Georgia to

---

[3] The District Court referred Isom's petition to a Magistrate Judge, who issued a Report and Recommendation recommending that the District Court deny the petition.

3

ask a spiritual adviser named "The Root Man" who stole the money. Smith saw The Root Man the same day. The Root Man said that Smith's ex-girlfriend's brother took the money. Smith's ex-girlfriend had two brothers–Lem Larkin and Tony Larkin. Smith told Petitioner he didn't believe The Root Man and did not believe Lem Larkin would break into his house. The next day, Petitioner and Truth Miller came from Orlando to Smith's apartment in Gainesville. There, they contacted Miss Cleo's psychic hotline for a description of the "burglar." The psychic described the person as light-skinned, 5' 6", with a facial disfigurement. The description matched Lem Larkin, who had a glass eye. Later that day, Petitioner himself drove to Valdosta to see The Root Man. The Root Man told Petitioner that Smith's ex-girlfriend's brother broke into the house. When Petitioner returned from Georgia, he, Smith, and Truth Miller left in

Petitioner's rental car to look for Lem Larkin. They eventually spotted him walking outside a nightclub in Archer. Petitioner had a gun under a towel in the front seat, handed the gun to Truth Miller (who was in the passenger seat), and told Miller "to get him." Miller went behind the building and shot Larkin. Petitioner, Miller, and Smith drove away from the nightclub and to a lake, where Miller threw the .357 revolver. A dive team later searched the lake but did not recover the weapon. Truth Miller eventually became a suspect in the murder. However, before his arrest warrant could be served, he was found dead, less than a week after Lem Larkin's death.

The defense's theory of the case was that Victor Smith's testimony was not credible because he himself had motive to kill Lem Larkin, he received a suspended sentence for his testimony, and he had previously lied to authorities about what happened. The defense maintained that while Petitioner did come to Gainesville to talk to Lem Larkin about the burglary, he spent the night in a hotel room and was there at the time of the murder.

Doc. 45 at 2–4 (footnotes omitted).

## II.

4

The claim giving rise to the COA is Isom's argument that his trial counsel rendered ineffective assistance of counsel—and thus denied him his Sixth Amendment right to the effective assistance—regarding his desire to testify in his own defense at trial.[4]  Isom contends that he wanted to testify, but that counsel erroneously told him that if he did, the State could inform the jury of the specific nature of his prior convictions, including a prior murder conviction.  Doc. 45 at 41.  Isom presented this claim to the state trial court in a motion filed under Fla. R. Crim. P. 3.850.

In his motion, Isom informed the trial court that this is the testimony he would have given had his attorney called him to the witness stand:

> I would have testified that I did not participate in the murder of Lemuel Larkin and remained at the hotel all that night (from at least 11:00 PM until the following morning) with Quanesha Holland. I would have testified my only intent, which I had been insistent on with Victor Smith, was to speak with Lemuel Larkin to ascertain whether or not Victor Smith had himself been involved in the burglary/theft of my money and that I had no intentions or designs of harming any person. I would also have informed the jury that since I was a convicted felon, upon learning from Victor Smith the next morning when he brought our car back to the hotel that Lemuel Larkin had been shot, I returned to Orlando because I was afraid of being

---

[4] The Sixth Amendment, which has been made applicable to the States, *see Gideon v. Wainwright,* 372 U.S. 335, 345, 83 S. Ct. 792, 797, 9 L.Ed.2d 799 (1963), states, in pertinent part, "In all criminal prosecutions, the accused shall . . . have the Assistance of Counsel for his defence," U.S. Const. amend. VI. The "Assistance of Counsel" means the "effective" assistance of counsel.  *See, e.g., Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 2064, 80 L.Ed.2d 674 (1984

5

accused of being involved since I had been looking for Larkin the previous day.

*Id.* at 42.

In deciding whether Isom's attorney had denied him the effective assistance of counsel, the state trial court applied the two-pronged test for ineffective assistance of counsel established by *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail on his ineffective assistance claim, Isom had to demonstrate: (1) that his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness; and (2) that he suffered prejudice as a result of that deficient performance. *Strickland*, 466 U.S. at 687–88, 104 S. Ct. at 2064–65. To establish prejudice under *Strickland,* "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." 466 U.S. at 693, 104 S. Ct. at 2067. Rather, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. The trial court assumed for sake of argument that Isom established *Strickland*'s first prong, and, moving to the second prong, found that Isom had failed to show the requisite prejudice. The trial court explained why Isom had failed to establish prejudice, thusly:

6

Defendant alleges that, had he taken the stand, he would have testified to the Defendant alleges that, had he taken the stand, he would have testified to the following: (1) he "did not participate in the murder of Lemuel Larkin [the victim]""; (2) on the day before the murder, he was looking for the victim, but only" to ascertain whether or not Victor Smith had himself been involved in the burglary/theft of[his] money"; (3) he had "no intentions or designs of harming any person"; (4) he remained in his motel room "from at least 11:00 p.m." the night before the murder "until the following morning" with Quanesha Holland; and, (5) "since [Defendant is] a convicted felon, upon learning from Victor Smith the next morning[,] when he brought [their] car back to the hotel[,] that Lemuel Larkin had been shot, [Defendant] returned to Orlando because [he] was afraid of being accused of being involved since [he] had been looking for Larkin the previous day." With the exception of point #5, Defendant's proposed testimony is essentially defense counsel's closing argument to the jury.

When weighed against the testimony actually presented at trial, Defendant's proposed testimony does not create a reasonability probability that the outcome of the proceeding would have been different. First, the testimony of Victor Smith, as described in ground (VI) above, places Defendant at the crime scene directing Truth Miller to kill the victim. Second, Truth Miller was identified by witnesses as the person who shot the victim. Third, it is *undisputed* that Defendant was looking for the victim *before the murder.* The testimony at trial reflects that Defendant was looking for the victim *between 10:00 p.m. and* 11*:00 p.m.* on the *night* of Saturday, December 8, 2001. The murder occurred at, approximately, 2:00 a.m. on Sunday, December 9, 2001, which is only a few hours after Defendant *started* looking for the victim. Fourth, it is *undisputed* that Truth Miller came to Gainesville from Orlando *with* Defendant. Finally, it is *undisputed* that Defendant left Gainesville and returned to Orlando *within hours after the murder.*

In summary, the sole issue that the jury had to decide was whether or not they believed the testimony of Victor Smith: Victor Smith was the only witness at trial who could place Defendant at the crime scene; Victor Smith himself had an apparent motive to kill the

7

victim (to cover up Smith's theft of Defendant's money); Victor Smith had a motive to lie at the trial (he received a sentence reduction in exchange for his testimony); and, most importantly, Victor Smith told Defendant that the victim was the person who stole Defendant's money, which was the catalyst for Defendant's search for the victim (and use of two psychics for confirmation). *All* of these facts, which weigh *heavily* in Defendant's favor, were *known to the jury* when they found Defendant guilty of first-degree murder and conspiracy to commit first-degree murder.

Defendant's proposed testimony contradicts, but does not refute, Victor Smith's claim that Defendant was at the scene of the murder. It does not refute the fact that Defendant drove from Orlando to Gainesville, for the purpose of confronting the victim about his stolen money, with the person (Truth Miller) who, ultimately, shot the victim. It does not refute the fact that Defendant was actively looking for the victim mere hours before the murder, as well as telling the victim's family that the victim had better give him his money by moming. It does not refute the fact that Defendant left Gainesyille, and returned to Orlando, mere hours after the murder. Furthermore, according to trial counsel's testimony during a prior evidentiary hearing, Quanesha Holland (Defendant's alleged alibi witness) could not support Defendant's claim that he was with her in the motel room between 11 :00 p.m. on Saturday and 8:00 a.m. on Sunday. Had Defendant testified as he alleges, there is not a reasonable probability that the outcome would have been different.  This claim is without merit.

Doc. 14-31, at 33–35 (record citations omitted).  As noted above, the trial court's Rule 3.850 decision was affirmed on appeal.  *Isom*, 993 So.2d at 967.

III.

A federal court may only grant habeas relief on a claim previously adjudicated in state court if the adjudication: (1) resulted in a decision that was

8

contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d).

The Supreme Court has explained the meaning of some of the phrases contained in §§ 2254(d)(1) and (2).  In § 2254 (d)(1), the phrase "clearly established Federal law" refers only to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).  A state court decision is "contrary to" a Supreme Court holding "if the state court (1) arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or (2) decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  *Id.* at 412–13, 120 S. Ct. at 1523.  A state court decision "involve[s] an unreasonable application of" a Supreme Court holding "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413, 120 S. Ct. at 1523.  Merely incorrect application of federal law, however, is not enough to warrant habeas relief. Instead, "[a] state court's determination that a claim lacks merit precludes federal

9

habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter,* ___U.S. ___, ___, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (quoting *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004)).

In deciding whether the state court decision is based on an unreasonable determination of the facts in light of the evidence presented in the state court, we must indulge the presumption that the state court's findings of fact are correct. 28 U.S.C. § 2254(e)(1).

## IV.

Isom argues that the state court's decision rejecting his ineffective assistance claim constituted an unreasonable application of *Strickland.* We are not persuaded. A review of the transcript of Isom's trial reveals, first, that had Isom testified as proposed, his testimony would have been contradicted by the testimony of the State's witnesses. Next, had Isom testified, he would have been subject to cross-examination, which would have potentially undermined any persuasive value his testimony on direct examination may have had. Further, his attorney presented to the jury in closing argument the points Isom's testimony would have covered. In fact, his proposed testimony mirrored his attorney's closing argument to the jury. In sum, it was not objectively unreasonable for the state trial court to

10

conclude that, had Isom testified as proposed, the outcome of his trial would not have been different. *See Brown*, 272 F.3d at 1313. Accordingly, the district court did not err in denying Isom's § 2254 petition.

   **AFFIRMED.**

11