# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 70666-7-I |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| KIEL NOEL DENT, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 24, 2014 |
| | ) | |

APPELWICK, J. — Dent appeals his conviction for forging an Oxycodone prescription in violation of the Uniform Controlled Substances Act.[1] He contends that the trial court erred in admitting statements he made during a custodial interrogation prior to receiving Miranda[2] warnings. He argues that he would not have been convicted had the statements been excluded. We affirm.

## FACTS

On May 11, 2012, Officer Natalie D'Amico was dispatched to a Rite Aid store in Redmond, Washington. A pharmacy technician from Rite Aid had called 911 to report Kiel Dent as a possible suspect of prescription forgery. As Officer D'Amico walked into the Rite Aid, a store employee behind Dent pointed to him as if he were the man the store

---

[1] Chapter 69.50 RCW.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

reported. Dent was approaching the exit of the store. Dent matched the description the pharmacy technician had provided over the phone. Officer D'Amico approached Dent, who was on his phone at the time, and said, "Mr. Dent." Officer D'Amico was wearing a police uniform. Dent stopped and looked at Officer D'Amico and put down his phone.

Officer D'Amico then asked Dent to step outside of the store. Dent cooperated and walked outside with Officer D'Amico. At Officer D'Amico's request, Dent sat down on a bench outside of the store. Officer D'Amico remained standing. Officer D'Amico's patrol car was parallel parked outside the store within 15 feet of the bench.

Officer D'Amico asked Dent if he had any identification. Dent handed Officer D'Amico his Washington identification card (ID) that confirmed Dent's identity. Officer D'Amico then asked Dent why he was at the Rite Aid. Dent responded that he had gone there to fill his prescription for oxycodone. Dent explained that he had been in a car crash and needed the oxycodone to help with the pain. Officer D'Amico asked Dent what injuries he suffered as a result of the crash. Dent was not able to provide an answer or any additional details about the car accident.

Officer D'Amico asked Dent how he obtained the prescription. Dent claimed that he received it from a family friend. Officer D'Amico asked Dent if that friend was a doctor, and Dent said, "'I thought so.'" Officer D'Amico asked Dent if he knew the name of the person who provided the prescription. Dent responded that he did not know. But, Dent said that he received the prescription from someone at a house somewhere between Burien and White Center. According to Officer D'Amico, Dent was not in custody at the time she asked him these questions.

2

After Officer D'Amico finished questioning Dent, she waited for another patrol officer to arrive to stay with Dent. Officer D'Amico then went back into Rite Aid to speak with the technician, Kevin Christoph, who assisted Dent with the prescription and made the initial 911 call.[3] He said that he was suspicious about the prescription, because oxycodone was misspelled and there was a forgery note on file for the doctor listed on the prescription. Christoph said that the forgery note requested that the doctor, Dr. Andrew Graustein, be contacted to verify all prescriptions before filling the requests. Christoph stated that he spoke with Dr. Graustein about the prescription and Dr. Graustein confirmed that the prescription was invalid.

After speaking with Christoph, Officer D'Amico called Dr. Graustein. Dr. Graustein confirmed that he did not know Dent and did not write an oxycodone prescription for him. After speaking with Dr. Graustein, Officer D'Amico walked back outside. Dent was still sitting on the bench with the other officer standing in front of him. At that point, Officer D'Amico arrested Dent and read him his CrR 3.1[4] rights.

Dent was charged with violation of the Uniform Controlled Substances Act – forged prescription, RCW 69.50.403(1)(c).[5]

Dent moved to have the statements he made to Officer D'Amico suppressed. The trial court held a CrR 3.5 hearing in which Officer D'Amico testified to the questions she

---

[3] Officer D'Amico had returned Dent's ID to him before going back into Rite Aid. It is unclear from the record exactly when Officer D'Amico returned the ID to Dent. The record indicates only that Officer D'Amico returned the ID to Dent sometime between originally asking for it and when she went back into Rite Aid.

[4] CrR 3.1 provides that all persons taken into custody must be immediately advised of their right to a lawyer. However, unlike Miranda, it does not require advisement of the right to remain silent. Compare CrR 3.1, with Miranda, 384 U.S. at 479.

[5] Dent was also charged with and convicted of identity theft in the second degree. This charge was eventually vacated.

3

asked Dent and his responses prior to receiving Miranda warnings. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). Dent argued that his statements should have been excluded, because he made them subject to custodial interrogation without first receiving his Miranda warnings. The trial court concluded that Dent's statements were admissible, because "Miranda was not applicable as the defendant was not in custody to the degree associated with formal arrest. These statements were voluntary." In reaching that conclusion, the court opined that under the circumstances—Dent was sitting on a park bench and he was not handcuffed—there was no formal custody or arrest. It further noted that Officer D'Amico conducted a limited investigation and interrogation that was not custodial in nature. As a result, the trial court found that Miranda did not attach until Dent was formally arrested.

At trial, the State presented the forged prescription along with five witnesses including Officer D'Amico; Rite Aid pharmacy technicians, Christoph and Margaret Lyons; and Dr. Graustein.

The jury found Dent guilty of Violation of the Uniform Controlled Substances Act – Prescription Forgery. Dent appeals.

## DISCUSSION

Dent argues his statements to Officer D'Amico should have been excluded, because he was in custody and thus entitled to Miranda warnings.[6] Additionally, he argues that the admission of the statements was not harmless error.

---

[6] Dent assigns error to conclusions of law (a)(i)-(ix). These conclusions admitted Dent's statements into the State's case-in-chief.

4

Miranda warnings must be given whenever a suspect is subject to custodial interrogation by a state agent. 384 U.S. at 467-68; State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). If police conduct constitutes a custodial interrogation without Miranda warnings, statements made by the suspect during the interrogation must be suppressed. Miranda, 384 U.S. at 479. A person is in "custody" for the purpose of custodial interrogation if, after considering the circumstances, a reasonable person would feel that his freedom was curtailed to a degree associated formal arrest—an objective test. Heritage, 152 Wn.2d at 218. The defendant must show some objective facts indicating his freedom of movement or action was restricted or curtailed. State v. Lorenz, 152 Wn.2d 22, 36-37, 93 P.3d 133 (2004). We review a trial court's custodial determination de novo. Id. at 36. Statements admitted in violation of Miranda are subject to harmless error analysis. State v. Reuben, 62 Wn. App. 620, 626, 814 P.2d 1177 (1991).

Dent argues that the circumstances surrounding his encounter with Officer D'Amico illustrate that he was in custody when he answered her questions. While there are objective facts supporting both the State's and Dent's arguments, overall, the facts here indicate that neither Dent, nor a reasonable person in the same situation, would have felt that his or her freedom was curtailed to a degree associated with formal arrest prior to and during the questioning.

Officer D'Amico initially asked to speak with Dent and did not command it. Additionally, Officer D'Amico asked Dent to sit on a public bench in the middle of the day. She did not demand it. Dent was not handcuffed, and he was not in a police car or another confined space. There is no evidence in the record that Officer D'Amico ever touched

Dent or told him that he was required to stay and answer questions. Further, that Officer D'Amico was wearing a police uniform, her squad car was in Dent's line of sight from the bench, and she and the other officer were standing as Dent sat on the bench do not alone result in Dent being in custody. In fact, courts have found defendants not to be in custody for custodial interrogation purposes even within the confines of a law enforcement building or with several law enforcement officers present. See, e.g., Yarborough v. Alvarado, 541 U.S. 652, 656, 665, 124 S. Ct 2140, 158 L. Ed.2d 938 (2004); Howes v. Fields, ___ U.S. ___132 S. Ct. 1181, 1185-86, 1188-89, 182 L. Ed. 2d 17 (2012).

Officer D'Amico did not consider Dent in custody when she was asking him questions. Officer D'Amico did ask for and take Dent's ID, but she returned it to Dent after asking him questions but before going into Rite Aid. Officer D'Amico did not go back into the store until another officer arrived. That Officer D'Amico purposefully waited for the other officer to arrive before going back into Rite Aid, would signal to a reasonable person that his or her freedom was curtailed at that point. That action signaled to Dent that Officer D'Amico did not feel comfortable leaving him alone outside for fear that he might leave—an indication that he was not free to go. But, sequentially, this did not happen until after Officer D'Amico had already asked Dent her questions and not until after Dent had already provided the statements at issue.

Dent was not in custody, at least until Officer D'Amico decided not to leave his side until another officer arrived. At that point he was no longer free to leave, but the questioning was over. We do not believe that Dent's freedom of action was limited to a degree associated with formal arrest during the questioning.

However, even if Dent's statements were admitted in error, we find that the error was harmless. A constitutional error is harmless if we are convinced beyond a reasonable doubt that any reasonable jury would have reached the same result absent the error. State v. Guloy, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985). We look at only the untainted evidence to determine if the evidence is so overwhelming that it necessarily leads to a finding of guilt. Id. at 426.

Dent contends the admission of his statements was not harmless, because the statements formed the overwhelming proof of the mens rea element of RCW 69.50.403. RCW 69.50.403(1) states:

> It is unlawful for any person <u>knowingly</u> or <u>intentionally</u>:
>
> . . . .
>
> (c) To obtain or attempt to obtain a controlled substance, or procure or attempt to procure the administration of a controlled substance, (i) by fraud, deceit, misrepresentation, or subterfuge; or (ii) by forgery or alteration of a prescription or any written order.

(Emphasis added.)

At trial, the State presented the prescription itself as evidence. Further, the jury heard testimony from Lyons, Christoph, and Dr. Graustein. The prescription and the testimony demonstrated that "oxycodone" was misspelled on the face of the prescription, the amount and dosage of the drug were rather large, and there was a clinic listed on the prescription that did not exist. Further Dr. Graustein testified about not knowing Dent nor having ever treated Dent.

Based on the untainted evidence, any reasonable jury would conclude beyond a reasonable doubt that the prescription was forged. Further, a reasonable jury would

7

conclude that Dent knowingly and intentionally attempted to obtain the oxycodone by means of a false and forged prescription in light of the fact that his name was on the prescription yet he had never met or been treated by the doctor who allegedly wrote it.[7] Any potential error was harmless.

We affirm.

_____

WE CONCUR:

_____

_____

_____

<hr>

[7] Dent's statements were not even the State's strongest evidence that Dent acted knowingly or intentionally. Nothing Dent said in his conversation with Officer D'Amico unequivocally confirmed that he acted knowingly or intentionally whereas Dr. Graustein's testimony confirmed that Dent had never been treated by the doctor who allegedly wrote the prescription—a much more compelling piece of evidence.