NOT RECOMMENDED FOR PUBLICATION
File Name: 16a0541n.06

No. 14-5985

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 20, 2016
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| PHEDREK T. DAVIS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| DEBRA K. JOHNSON, Warden, | ) | COURT FOR THE MIDDLE |
| | ) | DISTRICT OF TENNESSEE |
| Respondent-Appellee. | ) | |
| | ) | |
| | ) | |

BEFORE:     MOORE, ROGERS, and SENTELLE, Circuit Judges.[*]

ROGERS, Circuit Judge.   In 2005, a Tennessee jury convicted Phedrek T. Davis of killing Susan Phelps after opening fire on her through her living room window.  On appeal from the district court's denial of federal habeas relief, Davis contends that four times during its rebuttal closing argument the prosecution misstated ballistics evidence that was central to its case against him—an act of misconduct that Davis contends denied him a fair trial.   The state appellate court, however, saw not a misstatement of evidence but a reasonable inference from it, and ruled against Davis on his prosecutorial-misconduct claim.   The district court properly determined that the state court's opinion in this regard was not unreasonable.  Habeas relief was therefore not warranted.

---

[*]The Honorable David B. Sentelle, Senior Circuit Judge for United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

I.

The Tennessee Supreme Court has set forth the underlying facts of this case.

This case arises out of the shooting death of Susan Phelps on August 21, 2003, as she stood inside her apartment in Nashville, Davidson County, Tennessee.

Mr. Eula Beasley testified that he had known the victim two to three months prior to her death and had visited her apartment "a lot." On the day of the shooting, Mr. Beasley was at the victim's apartment along with several other people. Because the electricity was out in the apartment, the victim had run an extension cord from [Davis's] apartment to hers. According to Mr. Beasley, [Davis] saw the victim coming out of his apartment and accosted her on the sidewalk. Mr. Beasley was standing next to the victim when this occurred. [Davis] slapped her across her face and said, "bitch, I'm going to get you, don't be in this house when I come back." Mr. Beasley had previously told one of the detectives that the Defendant also threatened "to kill her when he come [sic] back, he was going to shoot up the house and everything."

After this altercation, Mr. Beasley and the victim were both in the victim's living room "having fun." Mr. Beasley explained that he had not taken [Davis's] threats seriously. Within fifteen minutes, Mr. Beasley saw [Davis] walking fast toward the victim's apartment. As [Davis] came abreast of the living room window, which was open, he began shooting into the apartment through the window. [Davis] continued walking and shooting. Mr. Beasley described the gun as an automatic which [Davis] was firing with one hand. The victim was standing "right in front of the window." When the gunfire began, Mr. Beasley turned and ran to a back room where he broke a window and jumped out. He did not see the victim get shot. He did, however, hear "a bunch" of shots.

After jumping through the window, Mr. Beasley ran up the alleyway, where he hid in some bushes out of fear. From there, he saw [Davis] drive by.

. . . .

George Boone testified that he had known the victim several months before her death. On the day of the shooting, he and several other people were at the victim's apartment. The victim was walking outside. Mr. Boone stated that, while he was standing in her living room looking out the door, he saw an altercation between [Davis] and the victim; he saw no one else present during the argument. Mr. Boone heard [Davis] call the victim "bitch" and state, "somebody got my stuff." He saw [Davis] slap the victim, after which she walked a short distance away. [Davis] also left. After the victim returned to her apartment, [Davis] "came to the door after that and said, somebody got my shit, you-all need to get up out of here." Mr. Boone testified, "He said I don't care if it's your

husband or whoever is in there, when I come back I'm going to shoot this m* * * * * f* * * * * up." None of the other people in the apartment responded to [Davis], but Mr. Boone "told them, they need to come out of there because of what he said." Although the others did not take [Davis's] threat seriously, Mr. Boone did, and he walked out of the apartment.

Mr. Boone stationed himself a short distance away, in front of the apartment. From his position, he could look through the living room window; he saw the victim sitting in front of it. Fifteen to thirty minutes later, he saw [Davis] returning. [Davis] walked over to near where Mr. Boone was standing, reached down, and "come [sic] up with a pistol." [Davis] pointed the gun and "opened fire." Mr. Boone stated that [Davis] shot through the window and that he shot from right to left. Neither man spoke to the other. When he was done shooting, [Davis] "just walked on back around the building" where he got in a car and drove away.

Mr. Boone went to the apartment and looked in. He saw the victim lying on the floor.

Dr. Stacy Turner testified about the victim's autopsy. According to Dr. Turner, the victim had suffered a gunshot wound to the face in which the bullet perforated the victim's right carotid artery and caused her death. The bullet was recovered from the victim's body.

Officer William Kirby, a member of the identification crime scene section of the Metro Nashville Police Department, testified that he reported to the scene of the crime at about 4:30 in the afternoon on the day it occurred. He stated that it was a bright and sunny day and that he could see through the apartment's living room window (which was open) into the interior. Officer Kirby confirmed that the apartment had no electricity. He composed an accurate, although not to scale, drawing of the scene. The drawing depicted an apartment with a front door between two front windows. The door and window to the right of the door (from the perspective of one approaching the door from the outside) were along the outside wall of the living area. The window to the left of the door was along the outside wall of a bedroom. The living room window bore three bullet strikes: two to the frame and one through the screen. The front door frame bore one bullet strike. The bedroom window bore four bullet strikes-one to the frame and three through the glass-and the interior wall of the bedroom (parallel with the outside wall in which the window was located) also bore four bullet strikes. In the area in front and outside of the bedroom window, six 40 caliber shell casings were found. In the living room, a lead bullet was found; in the kitchen, near where the victim fell, a copper jacket was found. In the bathroom, another copper jacket was found and in the back bedroom, another lead bullet. [FN1]

[FN1. An expert witness explained to the jury that the type of bullets recovered from the scene consisted of an inner lead core surrounded by a copper brass alloy jacket and that the two layers sometimes separated on impact.]

Officer Kirby testified that, although he and other members of the unit searched "front, back and side" for shell casings, the only ones they found were in the area fronting the bedroom window. He also opined that "at least five [bullets] made it inside of the apartment."

. . . .

Officer Kendall Jaeger testified that he is a "firearm tool mark examiner in the forensics and firearms section of the identification section" of the Metro Nashville Police Department. He examined the projectiles and discharged cartridge cases that were recovered during the investigation of this case. He determined that the six cartridge cases had all been discharged from a single weapon and that the weapon was a semi-automatic handgun.

Officer Jaeger was unable to identify the bullet that was recovered from the victim's body because the metal jacket surrounding the lead core had been stripped away. He identified two complete bullets recovered from the scene and two bullet jackets recovered from the scene as having been fired from the same gun. Because the gun that fired the cartridges was not recovered, however, he was unable to state conclusively that the cartridge cases and the bullets/bullet jackets were fired from one and the same gun. He acknowledged, however, that it was reasonable to infer that the same gun fired both the cartridge cases and the bullets.

*State v. Davis*, 266 S.W.3d 896, 898-900 (Tenn. 2008). At trial, Davis advanced the theory that a second shooter had returned fire from inside the apartment, shooting and killing Phelps in the crossfire. Although he offered no proof of his own, *Davis*, 266 S.W.3d at 900, Davis nevertheless pointed to the inability of the state's ballistics expert to link the cartridge casings found outside Phelps's apartment windows to either the bullet strikes or fragments found inside the apartment. During rebuttal closing argument, the prosecution sought to respond to Davis's second-shooter theory, and in the course of a discussion as to why that explanation did not add up, the prosecutor noted that the "[bullet] jacket [found near Phelps's body] matches the slug that was in her head." Davis's counsel objected on the ground that the remark "misstate[d] the

evidence," which the trial judge overruled, noting that, as it was "final argument," the question was "for the jury to decide." The prosecution then resumed its discussion of the second-shooter theory, offering three more conclusions about the ballistics evidence: (1) "it all has to match up, and it does"; (2) "[a]ll the cartridges are outside and then the various pieces of the bullets as they pass through the window all match together or fit"; and (3) "for each [of the] six [casings] we have a destination of a slug and a jacket that matches with it inside the house." The last remark again provoked an objection from Davis's counsel, which was once again overruled on the same grounds.

A jury ultimately convicted Davis of the first-degree murder of Phelps, the attempted second-degree murder of Beasley, and a misdemeanor assault on Phelps, and the trial court sentenced Davis to life imprisonment plus fifteen years. The Tennessee Court of Criminal Appeals and the Tennessee Supreme Court affirmed those convictions on the ground, among others, that the prosecution had not misstated the ballistics evidence during its closing rebuttal but had instead drawn a reasonable inference from it. As the intermediate state court explained, in the last reasoned opinion on Davis's prosecutorial-misconduct claim:

> Although the prosecutor is not permitted to misstate the evidence, he or she may present argument about any reasonable inferences which may be drawn from the evidence. *State v. McCary*, 119 S.W.3d 226, 253 (Tenn. Crim. App. 2003). Detective Jaeger testified that all six cartridges were found in the same general location outside the front bedroom window of the victim's apartment. All of the bullet jackets found inside the apartment were fired from the same gun, and all of the cartridges found outside the apartment were fired from the same gun. Detective Jaeger could not, however, state conclusively that the bullet jackets found inside the apartment were fired from the same gun because he was not able to examine the gun itself in order to make that determination. Detective Jaeger acknowledged during his direct examination that the inconclusiveness of this aspect of his examination "did not leave out a common sense inference" that the bullet jackets and the cartridges were fired from the same firearm.
>
> Based on the foregoing and our review of the record, we conclude that the prosecutor did not intentionally misstate the evidence. The prosecutor drew a reasonable inference about the relationship between the bullet jacket found next to

the victim and the bullet core retrieved from her body in response to defense counsel's closing argument.

*State v. Davis*, 2007 WL 2051446, at *22 (Tenn. Crim. App. July 19, 2007). In Davis's subsequent federal habeas petition, he once again alleged, among other things, that the prosecution had engaged in misconduct by misstating evidence with its four statements during closing argument, thus denying Davis his federal constitutional right to due process. The district court reasoned as follows:

> Prosecutors "must be given leeway to argue reasonable inferences from the evidence." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000) (quoting *United States v. Collins*, 78 F.3d 1021, 1040 (6th Cir. 1996)). In his comments [that the bullet jacket "matches" the slug recovered from Phelps's head], the prosecutor was obviously theorizing about how the lead bullet wound up in the victim's head with an empty metal jacket loose nearby, and her argument about their "match[ing]" was based on logic rather than a reference to the scientific evidence. The prosecutor certainly could have more clearly qualified her comments as theory or assumption. *See id.* at 536 (finding that prosecutor's comments did not mislead jury where they were qualified with "you would have to assume" and "I speculate"). However, even if the failure to do so rendered her argument improper, it would not rise to the level necessary to warrant habeas relief where the scientific evidence was too clear for the jury to be misled by the closing argument, and the other evidence in the case overwhelmingly proved the Petitioner's guilt. *See id.*

*Davis v. Johnson*, No.3:11-cv-0613, 2014 WL 3784342, at *23 (M.D. Tenn. Aug. 1, 2014). The district court denied the petition, and Davis appeals. We granted a certificate of appealability limited to Davis's claim that the alleged prosecutorial misconduct during rebuttal closing argument deprived him of due process.

II.

Davis's theory on appeal depends on the idea that the evidence directly contradicts the statements by the prosecutor in closing argument that the slug found in the victim's head matched the jacket found near the victim, that the various slugs and jackets "all match together and fit," and that the six casings found outside all "have a destination of a slug and a jacket that

matches with it inside the house." If these words connote "scientific match," they are clearly contradicted by the evidence, which with respect to matches showed only that the casings were all from the same gun, that the jackets found in the house were from the same gun as each other but not necessarily the single gun that fired the casings, and that there was no way to match the slug found in the victim's head, which had separated from its jacket. But in context of the closing argument, it is reasonably clear that the connotation of the word "match" in the prosecutor's argument was not "scientific match" but rather "correlation" or "goes with." There was no use of the term "scientific match," or any indication that there was a scientific match other than the use of the word "match." Indeed, if the prosecutor had said there was a scientific match, any juror who had been paying attention to the testimony would have known that the prosecutor was wrong, as the absence of a scientific match between the jacket and the slug was very explicit in the testimony. Instead, the prosecutor was responding to the argument of the defense lawyer speculating that there was another person with another gun at the scene who could have shot the victim. The prosecutor's response was to explain how well the evidence that there was "fit" with the prosecution's theory of the case. The slug that killed the victim correlated with the jacket found near the body. All the jackets were from the same gun. All the casings were from the same gun. Everything, in other words, correlates with or fits the government's theory. Unfortunately, the prosecutor repeatedly used the term "matches" instead of "correlates" or "goes with." But in context, it is apparent that the connotation of the prosecutor's use of "matches" was "correlates" rather than "scientifically matches." In any event, that is what the state court appears to have concluded, and its conclusion was hardly unreasonable.

Because a fair-minded jurist could thus see each of the prosecution's four statements as an inference from a series of facts established at trial, in response to Davis's second-shooter theory, the state court's decision comfortably meets the constitutional demands of due process, requiring the prosecution not to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). This court accordingly cannot grant Davis the habeas relief he seeks under § 2254(d)(1)'s unreasonableness prong, limited as we are to granting that relief only in cases where "there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." *Richter*, 562 U.S. at 102. By design, that is a hard test to pass, *id.*, and it is even harder where—as in the case of the "highly  generalized" *Darden-Donnelly* standard, *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012)—the relevant "rules are more general," leaving the state court with "more leeway" in its "case-by-case determinations," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). As explained, however, Davis simply cannot pass that test here.

Davis contends nonetheless that the first of the prosecution's disputed statements—which was the state court's focus in adjudicating Davis's prosecutorial misconduct claim—was a simple misrepresentation of what the ballistics evidence showed. Although the prosecution claimed during its closing rebuttal that the "[bullet] jacket [found near Phelps's body] matches the slug that was in her head," in fact the state's ballistics expert had testified that he was unable to draw any conclusion as to whether the naked slug recovered from the victim's skull matched the bullet jacket found near her body. But as indicated above, that is only one way to read the prosecution's statement, and hardly the most plausible in the context of a rebuttal closing argument, where improvisation all too commonly leads to infelicity and imprecision, *Donnelly*,

416 U.S. at 646-47. Instead, given that the remark followed a long discussion of why the prosecution believed Davis's alternative second-shooter theory was simply "goofy,"—a discussion invited, much like in *Darden*, 477 U.S. at 182, by Davis's introduction of the second-shooter theory—a fair-minded jurist could just as reasonably read the prosecution's statement as the conclusion of an argument explaining why the evidence did not bear out Davis's theory. The bullet jacket thus "matched" the slug pulled from Phelps's skull in the unscientific sense that, with the circumstantial and testimony evidence overwhelmingly pointing to Davis as the sole shooter, the jacket and the slug likely came from the same bullet.

Indeed, the same could be said of each of the three remaining statements that Davis contests, all of which directly followed the first. In each case the prosecution was reiterating the same hypothesis, on the strength of the same circumstantial and testimonial evidence, that the various bullet fragments found inside and outside the apartment likely had the same origin—the handgun Davis was seen firing into the apartment. There may well be the same ambiguity lurking in these remarks as in the first. But this court is not free to give such an ambiguity "its most damaging meaning" or to assume that "a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly*, 416 U.S. at 647. It would be even less appropriate to do so in this case, where the trial judge emphasized to the jury both before closing argument and after each of Davis's two objections that the prosecution's argument was just that—an argument, not evidence. Because this court must presume the jury heeded this instruction, *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009), there was leeway enough for the state court to have fairmindedly determined that the prosecution's remarks did not infect Davis's trial with the unfairness of misstated evidence.

Section 2254(d)(1)'s unreasonableness prong, so crucial to Davis's claim for relief, will not provide it here.

                                    III.

Although we have reviewed Davis's due process claim within AEDPA's forgiving framework of deference to state court adjudications, *Richter*, 562 U.S. at 101, Davis argues that this court should instead apply de novo review. His arguments on this point, however, are without merit.

Davis first argues that the last reasoned state court decision on his federal due process claim was contrary to clearly established Supreme Court precedent because the state court "neither cited, identified, nor applied the [relevant] federal due process standard" in ruling against his prosecutorial-misconduct claim. This failure of citation, Davis contends, is enough to justify this court's departure from AEDPA deference. In the alternative, Davis contends that this court should dispense with AEDPA deference on the related ground that the state court simply overlooked that claim, thus failing to adjudicate it on the merits as required for the application of AEDPA's deferential framework. 28 U.S.C. § 2254(d). Neither of these arguments is persuasive, however, because both have been plainly foreclosed by the Supreme Court.

Davis's principal argument against AEDPA deference fails because there is no need under AEDPA for a state court to acknowledge, let alone to invoke, Supreme Court precedent to have decided the merits of a federal claim. AEDPA permits a federal court to grant a writ of habeas corpus to a prisoner held in state custody "with respect to any claim that was adjudicated on the merits in State court proceedings" where the "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

The Supreme Court has explained that a state court decision will flunk the contrary-to prong of this two-part standard whenever the state court "applies a rule that contradicts the governing law set forth in" the decisions of the Supreme Court, in the sense of a having applied a rule that is "diametrically different, opposite in character or nature, or mutually opposed" to the rule laid down in those decisions. *Williams v. Taylor*, 529 U.S. 362, 405-6 (2000) (internal quotation marks omitted). Davis contends that the state court has done that here, by having failed to apply—in the sense of having failed to articulate—the *Darden-Donnelly* standard when considering his prosecutorial-misconduct claim. But as the Supreme Court has also explained, the "contrary-to" prong requires neither the citation of the Court's cases nor, for that matter, even an "awareness of [those] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002). That the state court here did not identify the relevant federal standard by name therefore does not, by itself, speak to the decision's conformity with clearly established federal law for the purposes of § 2254(d)(1).

Nor does Davis point to anything in the state court's reasoning or result that would indicate a conflict with the *Darden-Donnelly* standard. As the state court explained in rejecting Davis's prosecutorial-misconduct claim, Tennessee state law requires closing arguments to "be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." The state court accordingly weighed whether the thrust of one of the prosecution's statements during rebuttal closing argument was to "intentionally misstate the evidence," ruling instead that it was a "reasonable inference" drawn from the testimony of the state's forensic expert. Although Davis claims that the court's analysis lacked "the hallmarks of a due process analysis," in fact the main consideration cited by the state court—the impropriety of misstating evidence—was one of the same factors raised in *Darden*,

where the Supreme Court similarly considered whether prosecutors' statements during closing argument had denied the defendant a constitutionally "fair trial" by "manipulat[ing] or misstat[ing] the evidence." *Darden*, 477 U.S. at 181-82. Thus the only difference Davis cites between a claim under *Darden-Donnelly* and the claim that the state court in fact considered is merely verbal: whether the state court asked about whether comments were "sufficiently prejudicial" as opposed to what was "improper" under the law. But a state court need not have intoned the formulas of federal law to have reasoned in harmony with them or to have ended on the right note, *Early*, 537 U.S. at 8, and under § 2254(d)(1) it is the reasoning and result that count, *Williams*, 529 U.S. at 405. Davis has accordingly directed this court to no evidence that would justify rejection of AEDPA deference under its contrary-to prong.

This case is also different from *Lafler v. Cooper*, 132 S. Ct. 1376 (2012), relied upon by Davis. In *Lafler*, the state court had explicitly recognized the relevant federal claim—an "ineffective-assistance-of-counsel claim"—but had nevertheless "failed to apply" the relevant federal standard under *Strickland v. Washington*, 466 U.S. 668 (1984), there in the sense of having applied a substantively "incorrect" standard. *Lafler*, 132 S. Ct. at 1390. Here, however, as Davis repeatedly points out, the state court never identified the federal due process claim in so many words. Nor, as explained above, has Davis made any showing that the state rule the court did apply differed substantially from the correct *Darden-Donnelly* standard, as required under *Williams*. 529 U.S. at 405. There is accordingly no reason for this court to apply de novo review under § 2254(d)(1)'s contrary-to prong.

Davis's alternative argument against AEDPA deference likewise falters because it cannot overcome the strong presumption that the state court adjudicated his federal due process claim on the merits. As the Supreme Court explained in *Harrington v. Richter*, 562 U.S. 86 (2011),

"[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99. Although this is only a presumption, it is nevertheless a "strong one that may be rebutted only in unusual circumstances." *Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013). Davis has pointed to no such circumstances here. Nor has he given reason for this court to think some other explanation more likely, as required to defeat *Richter*'s strong presumption of adjudication on the merits, *Richter*, 562 U.S. at 99-100—at least none beyond the same unavailing fact of the state court's silence on his federal due process claim. However, "a state court need not state its reasoning or provide any explanation for its conclusions" to adjudicate a federal claim on the merits. *Brown v. Bobby*, 656 F.3d 325, 329 (6th Cir. 2011) (citing *Richter*, 562 U.S. at 98). Just as the state court's silence as to the federal due process claim does not mean that its reasoning or its result conflicted with the federal standard, the mere fact that the state court did not directly invoke the federal standard does not clearly lead to the conclusion that the state court overlooked it, *see Johnson*, 133 S. Ct. at 1094, 1097. This is especially true where—as here—the state claim considered on direct appeal turned on a factor critical to the argued federal claim: whether the prosecutor had misstated evidence in closing argument. Even if the state and federal claims, reviewed respectively under the state rule and the *Darden-Donnelly* standard, may not be exactly coextensive, their convergence on this important consideration makes it unlikely that the state court would have considered the state claim while leaving the federal one entirely out of account, *see id.* at 1098.

For much the same reason, Davis has also failed to rebut the *Richter* presumption with respect to the three other statements by the prosecution that went unmentioned by the state court.

As the Supreme Court has explained, the *Richter* presumption applies not only when a state court decision addresses *none* of a defendant's claims, but also "when a state-court opinion addresses some but not all" of them. *Johnson*, 133 S. Ct. at 1094. In Davis's case, even though the state court directly addressed only the first of the prosecution's four statements to which Davis now objects, he must accordingly do more than point to the state court's silence to defeat *Richter*'s strong presumption that the state court adjudicated his claim with respect to each statement. As noted above, however, he has not done that here.

Davis has consequently failed to make a showing sufficient to overcome *Richter*'s presumption that his federal due process claim, with respect to each of the four statements, was adjudicated on the merits. As a result, neither of Davis's arguments justifies this court's review of his federal due process claim de novo.

IV.

Finally, Davis's alternative argument for habeas relief under § 2254(d)(2) is also unavailing. Davis argues that the state court made unreasonable fact determinations by not explicitly addressing the last three of the four related challenges to the prosecutor's closing. Under § 2254(d)(2), this court will disturb "a decision adjudicated on the merits in a state court and based on a factual determination" only if it is "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Although it is hard to see what factual determination Davis has in mind here, the Supreme Court has nevertheless made clear in *Miller-El*, the same case on which Davis relies in arguing for relief under § 2254(d)(2), that "a state court need not make detailed findings addressing all the evidence before it," *id.* at 347, even if that means that some findings go unmentioned. This is especially sensible in this case, where all four of the prosecution's

statements rehearsed the same underlying hypothesis as to why the bullet fragments ended up where they did—that there was a single shooter firing from outside the apartment. That the state court adverted to this "common sense" hypothesis in addressing the first of the four statements, confirms that its determination on that statement swept broadly enough to cover the remaining three. Davis has thus failed to establish that the state court's determination was objectively unreasonable under § 2254(d)(2), and, as a result, has failed to justify habeas relief.

V.

For the foregoing reasons, the judgment of the district court is affirmed.

**KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.** Habeas courts may not grant relief unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). Although fair-minded jurists could possibly characterize the prosecutor's statements as reasonable inferences that the various bullet components matched up, equally fair-minded jurists could more logically characterize the prosecutor's statements as misstatements of the evidence, which was inconclusive on this point. Under these circumstances, applying *Richter* and the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(d), I concur in the judgment affirming the denial of habeas relief.