NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 17a0456n.06

No. 16-2261

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Aug 04, 2017
DEBORAH S. HUNT, Clerk

SCOTT SPAULDING,                              )
                                             )
        Petitioner-Appellee,                 )
                                             )
v.                                           )        ON APPEAL FROM THE
                                             )        UNITED STATES DISTRICT
JEFFREY LARSON,                              )        COURT FOR THE EASTERN
                                             )        DISTRICT OF MICHIGAN
        Respondent-Appellant.                )
                                             )
                                             )


Before: GIBBONS, KETHLEDGE, and DONALD, Circuit Judges.

KETHLEDGE, Circuit Judge. A Michigan jury convicted Scott Spaulding of repeatedly molesting his teenage stepdaughter. The Michigan Court of Appeals affirmed his convictions and the Michigan Supreme Court denied review. Spaulding thereafter sought a writ of habeas corpus under 28 U.S.C. § 2254, alleging ineffective assistance of counsel. The district court granted his petition, concluding that Spaulding had received ineffective assistance because his trial counsel had not consulted an expert on the behavior of sexual-assault victims. We respectfully disagree and reverse.

I.

In August 2009, Spaulding's stepdaughter ("PS") was babysitting for a close family friend, Nicole Humphreys, when PS saw a television show about a teenage girl whose father had sexually molested her. Around this time, Humphreys later testified, PS was not acting like her

usual self; though typically upbeat, she was "snippety" and "grouchy." When Humphreys asked PS if everything was okay, PS said no. Humphreys asked what was wrong, and PS started crying—first slowly, then "sobbing" so violently that "her whole body was shaking." Humphreys again asked what was wrong; although PS initially replied that she did not want to talk about it, she eventually said "my step dad has done things to me." Humphreys asked what specifically Spaulding had done, and PS refused to respond, saying that she did not want to ruin her family life. Humphreys then told PS to tell her mom and dad. PS responded by becoming even "more hysterical," crying so hard that "she could barely speak." Humphreys's husband joined the discussion a short while later, and he and Humphreys told PS that, if she did not talk to her parents soon, they would do so.

Later that week, PS told her father that Spaulding had sexually abused her. Her father took her to the Wexford County Sheriff's Department, where Deputy Jason Nehmer took a report with her father present, as required by department protocol for interviewing minors. According to Nehmer, PS seemed "really nervous" and "not ready to just spill everything out." PS told Nehmer that she was afraid of Spaulding because he had a bad temper and owned several guns.

Nehmer turned the case over to Detective Trent Taylor, who then interviewed Spaulding and Spaulding's wife (PS's mother). When Taylor asked Spaulding if he had touched PS's genitals, Spaulding replied that he did not know. Spaulding confirmed that PS had slept in bed with him and his wife a couple of times. He also said that he had "spoon[ed]" with PS on the couch—meaning that PS would lie on her side and Spaulding would lie behind her, with his stomach pressed against her back and his arm draped over her chest. Spaulding admitted that, while "spooning," he might have touched PS's breasts, but denied doing so intentionally. When asked whether PS was developing as a young woman, Spaulding said "oh, yes." Taylor then

asked Spaulding whether PS had ever stimulated his penis with her hand. Spaulding responded that it was possible because he was "a hard sleeper." Spaulding also confirmed that he had taken PS swimsuit shopping, and said that she looked like a "beautiful young lady" with her bikini on. After this interview, Taylor forwarded the case file to someone at Child Protective Services, Jamie LeMay, who then interviewed PS. A few weeks later, PS had an interview with a therapist named Barbara Cross.

About three weeks later, at Spaulding's probable-cause hearing (also known as the "preliminary examination"), PS testified that Spaulding had molested her numerous times in 2007 and 2008, beginning "[i]n December or January—December of 2007, January 2008." PS testified that, around that time, Spaulding touched her genitals while she slept next to him in bed. PS also testified that she and Spaulding would often "spoon" on the couch while watching TV. She then described several specific incidents of abuse, which she said occurred in May or June 2008. Sometimes Spaulding would "rub [her] back, and then move down to [her] stomach/side, and then . . . eventually move into [her] vagina, and rub that." On another occasion, he made her stimulate his penis with her hand. And he once licked her "vagina." PS testified that Spaulding had rubbed her genitals several other times before May 2008, but she did not recall any incidents prior to December 2007.

At trial, PS testified about the alleged abuse at greater length. When she was fourteen, around August 2007, she and Spaulding were "spooning" on the couch watching a movie. Spaulding began to rub her stomach, then moved his hands down into her pants and rubbed her genitals for about ten minutes. At one point, she tried to get off the couch, but Spaulding pulled her back down. About a month later, again while they were on the couch, Spaulding took her right hand and made her stimulate his penis with her hand. After five minutes or so, Spaulding

let go of her hand, and she went to the bathroom to wash up. Spaulding came into the bathroom and whispered, "you might want to wash your hands." He pointed to a spot on his pants, and told her that "it wasn't pee."

Another time, PS testified, she was sleeping in her mother's bed with her mother and Spaulding when he again put his hand down PS's pants and touched her genitals. PS did not tell her mother because Spaulding made her mother "really happy" and PS did not want to "ruin it for her." PS figured that, when she moved "out of the house in a couple of years," she could "just put it all behind" her.

PS also testified about an incident that took place in May or June of 2008. She and Spaulding were lying on the couch when she fell asleep and then awoke to Spaulding moving her leg. He draped one of her legs over the back of the couch, positioned himself between her legs with his head resting on her stomach, and began touching her "side leg" and "the side of [her] vagina." Spaulding then pulled her shorts and underwear aside and began licking her genitals, eventually penetrating her vagina with his tongue. Another night, around Christmas, PS slept in her mother's bed with her mother, her cousin Ariana, and Spaulding. Spaulding again massaged PS's stomach, rubbed her genitals, and told her that he had missed his "partner in crime" while she had been staying at her father's house. He also told her that she needed to shave her "beaver," a term for female genitalia that PS had heard Spaulding use with his friends.

According to PS, Spaulding also made other comments about her body, telling her that she looked "so much like [her] mother" and that she was "developing very nicely," which PS interpreted as a comment about her breasts. On one occasion, PS said, Spaulding took her shopping and had her try on several swimsuits in front of him. Spaulding made her buy a skimpy string bikini, even though PS wanted a swimsuit that "cover[ed] more."

PS's stepmother, Ericka Szegda, also testified at trial. According to Szegda, PS once came home with a bikini that was "so small that she was actually hanging out of the bottom of the suit." Szegda confirmed that Spaulding owned guns and had a bad temper, and she described several incidents in which she saw him fly into a rage.

On cross-examination of PS, defense counsel pointed out that, when PS spoke to Deputy Nehmer, she said that she had first been abused in her mother's bed in December 2007—whereas at trial she said that the first abuse took place on the couch around August 2007. PS responded that she had been "scattered on where the stories were." On the second day of trial, the State acknowledged that PS had "not been able to pinpoint dates and times," and moved to amend the information to incorporate a broader timeframe for the charged offenses. The trial judge said that PS had been "quite clear as to the circumstances surrounding the incidents, although very unclear as to the dates." He granted the motion to amend over defense counsel's objection, making the new range (on or about) October 2007 to (on or about) June 2008.

The prosecution later called Barbara Cross—who has a master's degree in social work and directs a mental-health clinic—to testify as an expert on the behavior of sexual-assault victims. Cross testified that delayed disclosure of sexual abuse is "very common," and that, when the abuser is a family member, "there's far more investment in keeping the secret" in order to "keep the peace." She also testified that it is "[n]ot at all rare" for victims to be inconsistent about dates, times, "maybe who was present in the home," and "maybe where they lived at the time," because "most kids don't document [the] dates and times of when they're being abused." On cross-examination, Cross admitted that she had testified only for the prosecution in sex-abuse cases, that her testimony was "generic" rather than specific to PS, and that children's allegations of abuse sometimes turn out to be false.

The defense called three witnesses. Spaulding's wife testified about her work schedule during the period of alleged abuse and how often people would have been present in the home. She also testified that PS had never told her about any abuse. PS's aunt, Meghan Nagel, testified mainly about the time that PS slept in Spaulding's bed around Christmas. Finally, Spaulding himself took the stand (against the advice of counsel) and denied the allegations of abuse. On cross-examination, he admitted to "spooning" with PS on the couch "several times," even though he "could have sat on a different chair." He also confirmed that he had helped her shop for a bikini. The prosecution called PS as a rebuttal witness; she reaffirmed that Spaulding had touched her genitals multiple times, put his tongue in her vagina, and made her touch his penis.

The jury convicted Spaulding of three counts of second-degree criminal sexual conduct and one count of first-degree criminal sexual conduct. For the former, he was sentenced to 3 to 15 years on each count; for the latter, he was sentenced to a concurrent term of 6 to 30 years. After sentencing, Spaulding filed an appeal and a motion to remand for an evidentiary hearing on his ineffective-assistance claim, in which he argued that his trial counsel should have consulted an expert on the behavior of sexual-assault victims. He attached an expert report from Dr. Katherine Okla, who holds a Ph.D. in clinical psychology, and who asserted that counsel could have rebutted the testimony of Cross and PS more effectively than he did—either by calling an expert to testify or consulting one to prepare for cross-examination. The Michigan Court of Appeals held that an evidentiary hearing was unnecessary and that Spaulding could not demonstrate the requisite prejudice from his counsel's putative mistakes. The Michigan Supreme Court denied review.

Spaulding then filed his habeas petition in federal district court, alleging that the Michigan Court of Appeals unreasonably denied his ineffective-assistance claim. The district

court granted Spaulding relief and ordered the State to release him or schedule a new trial within 90 days. The State appealed and the district court stayed its order pending appeal.

## II.

We review de novo the district court's decision to grant habeas relief. *Bray v. Andrews*, 640 F.3d 731, 734 (6th Cir. 2011).

## A.

As a threshold matter, the parties dispute which standard of review we should apply to the state court decision. The Michigan Court of Appeals rejected Spaulding's ineffective-assistance claim for failure to prove prejudice. In doing so, Spaulding contends, the court misconstrued the relevant legal standard. He argues that we must therefore review that decision de novo rather than under the deferential standard set forth in 28 U.S.C. § 2254(d)(1). Ordinarily, when a state court rejects a claim on the merits (as happened here), that "precludes federal habeas relief so long as 'fair minded jurists could disagree' on the correctness of that decision." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). If the state court applies a legal standard "contrary to" clearly established federal law, however, we are "unconstrained by § 2254(d)(1)" and "de novo review is appropriate." *Fulcher v. Motley*, 444 F.3d 791, 799 (6th Cir. 2006). For the purposes of this inquiry, the constitutional standard for prejudice set forth in *Strickland v. Washington* is "clearly established federal law." 466 U.S. 668 (1984); *Williams v. Taylor*, 529 U.S. 362, 390-91 (2000).

In deciding whether a state court acted "contrary to" *Strickland*, federal courts presume that state courts "know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam). But that presumption is rebuttable. If the state court begins by stating the *Strickland* standard correctly, the court's later use of "occasional shorthand" (though technically imprecise)

is permissible. *Woodford*, 537 U.S. at 23-24. A court that plainly applies the wrong standard, however, contradicts clearly established federal law and therefore receives no deference. *See Williams*, 529 U.S. at 405-06.

Here, the Michigan Court of Appeals never stated the *Strickland* standard correctly, and thrice stated it incorrectly. Under *Strickland*, a defendant need only show a "reasonable probability" that, but for counsel's deficient performance, the result of the proceedings would have been different. 466 U.S. at 694; *Williams*, 529 U.S. at 406. Yet here the court began by declaring, "[i]t is axiomatic that . . . a defendant must show" that "but for the deficient performance, the result of the proceedings would have been different." *People v. Spaulding*, No. 298743, 2011 WL 2858044, at *1-*2 (Mich. Ct. App. July 19, 2011). Then, after explaining why defense counsel's failure to retain an expert was not "outcome determinative," the court held that "we simply cannot conclude that the result of the proceedings would have been different but for the alleged deficiencies[.]" *Spaulding*, 2011 WL 2858044, at *1, 3. Thus, by all appearances, the court applied a "but-for" standard rather than the less rigorous "reasonable probability" standard from *Strickland*.

The State asks us to overlook these misstatements because the state court included a pincite to a Michigan Supreme Court case, which in turn recited the *Strickland* standard correctly. But appellate courts speak with words, not pincites. And here the Michigan Court of Appeals used the wrong words—three times—without once using the right ones. We therefore review de novo.

B.

Spaulding argues that his trial counsel was constitutionally ineffective for failing to retain an expert on the behavior of sexual-assault victims. To prevail, Spaulding must show both that

-8-

his lawyer's performance "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. Here, the State does not contest the district court's finding of deficient performance, so the only issue on appeal is prejudice. "*Strickland*'s test for prejudice is a demanding one": the likelihood of a different result must be "substantial, not just conceivable." *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Richter*, 562 U.S. at 112).

Spaulding argues that an expert like Dr. Okla could have assisted his defense in several ways. First, he contends, defense counsel could have called Okla as a witness to rebut the testimony of the prosecution's expert, Barbara Cross. As proof that Okla might have made a difference, Spaulding relies on Okla's expert report, wherein she criticizes Cross's testimony as "improper," "misleading," and "not based on current, valid scientific knowledge." But the only specific aspect of the testimony that Okla objects to is Cross's assertion that children very commonly delay disclosure of sexual abuse. And even there, Okla does not contest the basic factual claim; rather, she says only that delayed disclosure should not be cited as affirmative "evidence . . . that abuse must have occurred." But neither Cross nor the State cited PS's delayed disclosure for that purpose. Cross merely testified that, for a variety of reasons, victims tend not to disclose abuse immediately. And the State used that testimony not to argue that PS must have been abused, but to rebut the defense's argument that she must *not* have been abused because she did not speak up immediately.

Moreover, even if Okla had testified and cancelled out Cross's testimony about how victims generally behave, here the State produced ample evidence of the specific reasons why PS may have delayed her disclosure. By late summer 2008, PS had already moved out of

-9-

Spaulding's house, so the risk of abuse had declined. And multiple witnesses testified that Spaulding had a temper and owned guns, as PS told Deputy Nehmer when she was first interviewed. PS also testified that she was afraid to disturb the family peace, especially since she would soon be leaving home. Nicole Humphreys corroborated that testimony with her recollection that PS sobbed and shook violently when Humphreys urged PS to tell her parents. Finally, PS testified that her decision to come forward with the allegations was (at least in part) triggered by a television show that she had seen just before she spoke to Humphreys. In light of all these case-specific reasons for the delay, Cross's generic testimony about delayed disclosure was merely gilding the lily.

Indeed, the same could be said of Cross's testimony as a whole; though helpful, her testimony was far from critical to the prosecution's case. Cross offered a series of relatively unremarkable observations: child victims often get mixed up about the dates of their abuse, often do not tell other people right away, and often maintain relationships with their abusers. That is hardly the kind of expert testimony that can flip a jury's determination of guilt. *Compare, e.g.*, *Richey v. Bradshaw*, 498 F.3d 344 (6th Cir. 2007) (arson evidence); *Duncan v. Ornoski*, 528 F.3d 1222 (9th Cir. 2008) (blood evidence). Of greater consequence here was the testimony of several other witnesses. PS gave detailed, mostly consistent testimony about how Spaulding repeatedly molested her on the couch and in her mother's bed. Nicole Humphreys testified about PS's emotional state—"sobbing, her whole body [] shaking"—when she finally spoke up about the alleged abuse. And Spaulding himself made numerous damaging admissions: he repeatedly spooned with PS on the couch, he might have touched her breasts, she might have stimulated his penis, she saw his penis at least once or twice, and he took her shopping for a bikini. These were the star witnesses; Cross had only a modest supporting role.

Spaulding also asserts that, if Okla had testified, she could have helped the defense portray Cross as biased or unreliable because Cross is a therapist rather than a "scientist or forensic investigator." But Cross never claimed to be a scientist, and the prosecution never held her out as one. Indeed, when defense counsel asked Cross whether she was a scientist, she candidly said "no" and acknowledged that her testimony was based on her clinical experience. Okla asserts that an expert could have "alerted counsel to . . . the risk of pre-existing bias" in anyone who, like Cross, regularly receives referrals from Child Protective Services. But defense counsel made a similar attack on Cross's credibility, pointing out that she has testified only for the prosecution in sex-abuse cases. Thus, the marginal value of additional evidence of bias—as to a witness who was herself somewhat marginal—would have been slight.

Finally, Spaulding argues that Okla could have assisted the defense by highlighting deficiencies in the State's investigatory process. Specifically, Okla asserts that the manner in which PS was questioned may have rendered her testimony unreliable. According to Okla, the various people who interviewed PS failed to follow forensic interviewing protocol, which is important for obtaining "the most accurate and thorough information," especially from children. In particular, Okla says, Deputy Nehmer violated forensic protocol by failing to record the interview; by questioning PS in her father's presence (thereby creating a "non-neutral environment"); by failing to "present guidelines for telling the truth;" by failing to elicit a "free narrative;" and by failing to rule out alternative hypotheses. Jamie LeMay, the investigator from Child Protective Services who conducted the second formal interview, also failed to record the interview or take contemporaneous verbatim notes. And a few weeks later, Okla points out, Barbara Cross conducted a third formal interview, even though forensic protocol states that multiple interviews should be avoided. Spaulding suggests that these deficiencies may have

exposed PS to "interviewer bias," thereby leading her to adopt a false narrative. Spaulding Br. 26.

To begin with, defense counsel covered much of this ground at trial. On cross-examination, Nehmer admitted that he was not trained in forensic protocol, that his report on the interview was based on his recollection (rather than on contemporaneous, verbatim notes), and that PS's father was "in the room for the entire interview." Thus, additional testimony about Nehmer's interview would have been largely cumulative. *See Hanna v. Ishee*, 694 F.3d 596, 619 (6th Cir. 2012). Okla also criticizes Nehmer for failing to elicit a "free narrative" and rule out alternative hypotheses. But she does not identify any leading or otherwise suggestive questions. As for "alternative hypotheses," Okla suggests that PS may have fabricated the allegations against her stepfather out of anger or a desire for more attention. Neither theory, however, would likely have found traction here. PS did testify that she fought with Spaulding (and her mother) about the rules of the house, such as restrictions on what sports she could play and which friends she could have over. By the time PS accused Spaulding of molesting her, however, she had already moved out and was therefore no longer subject to Spaulding's rules. There is no reason to think these squabbles with Spaulding made her angry enough to fabricate allegations of abuse against him many months later. Nor is there reason to think PS was seeking attention. To the contrary, PS was apparently quite reluctant to speak up about the alleged abuse, and did so only in response to open-ended questions from a close family friend who noticed that PS was not her "normal self." Nothing in this record suggests that PS was out for revenge or attention.

Nor does Okla explain how LeMay's failure to record her interview or take contemporaneous notes could have affected PS's reliability as a witness. PS took the stand and

withstood sustained cross-examination. And the jury—which saw her testify firsthand—apparently found her credible. We will not displace that finding simply because Child Protective Services failed to follow best practices for memorializing interviews.

That leaves Okla's speculation about the risks of multiple interviews. As a practical matter, however, virtually every child sex-abuse investigation will involve repeated questioning by parents, social workers, police, and lawyers. To be sure, if multiple interviewers prompt a child with leading questions, that might affect her story. But there was no evidence of that here. And the only significant inconsistency in PS's various statements about the alleged abuse concerned its chronology—an issue defense counsel repeatedly brought to the jury's attention. Thus, highlighting the number of interviews would have added little to the defense.

Moreover, much of Okla's report focuses on the importance of following forensic protocol when interviewing "children." For example, Okla raises the concern that "children can be convinced of a different physical touch than that which they actually experienced." What goes for toddlers, however, might not go for sixteen-year-olds. According to many commentators, younger children are more suggestible and more vulnerable to coaching. *See, e.g.*, Jacqueline McMurtrie, *The Role of the Social Sciences in Preventing Wrongful Convictions*, 42 Am. Crim. L. Rev. 1271, 1284-85 (2005); Thomas D. Lyon, *Applying Suggestibility Research to the Real World: The Case of Repeated Questions*, Law & Contemp. Probs., Winter 2002, at 97, 113–14. Okla does assert—in passing and without citation—that adolescents too "can misinterpret non-sexual touch." But any suggestion along those lines would have been far-fetched here. There is no innocent reason for a stepfather to stick his tongue in his stepdaughter's vagina or to force her to stimulate his penis with her hand. And that is what PS—a sixteen-year-old girl of sound mind—testified that Spaulding did here.

In sum, we will grant that, had Spaulding's counsel retained an expert like Okla, he might have put on a somewhat stronger defense and the jury conceivably might have reached a different result. But the "likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. And we think it highly unlikely that expert testimony like Okla's would have changed the outcome in this trial, given the consistency of PS's substantive allegations and the significant tendency of Spaulding's own admissions to corroborate them. Indeed, *Strickland*'s "reasonable probability" standard is only "slight[ly]" less demanding than "more-probable-than-not." *Id.* Spaulding fell short of meeting that standard. His claim therefore fails.

## C.

In the alternative, Spaulding asks us to remand this case for the district court to consider several other alleged deficiencies in his trial counsel's representation: failure to file a timely witness list, failure to "properly prepare [Spaulding] and his wife to testify," failure to "research the State's allegations," and failure to learn that Barbara Cross had "previously been found to have given false testimony concerning her background." *See* Spaulding Br. 20 & n.17.

As to the claim about Cross's background, Spaulding points out that a magistrate judge in a prior case found that Cross had falsely testified about her membership in a professional association. *See* Spaulding Br. 28 (citing *LeBlanc v. Berghuis*, No. 1:02-CV-594, 2005 WL 2206480 (W.D. Mich. Sept. 12, 2005)). But the district court in that case rejected the magistrate's report and recommendation, and concluded that the controversy over Cross's membership in the association was a "tempest in a teapot" in light of her other, more important qualifications. *LeBlanc*, 2005 WL 2206480, at *3. Using this years-old controversy to impeach Cross, whose testimony was not critical to the prosecution's case anyway, could not plausibly

have altered the verdict here.  As to the other alleged deficiencies, Spaulding has not explained (either below or on appeal) how they supposedly prejudiced him.  Spaulding has thus forfeited those claims.  *See Thomas v. United States*, 849 F.3d 669, 679 (6th Cir. 2017).

\*     \*     \*

We reverse the district court's judgment, and remand with instructions to deny Spaulding's habeas petition.