*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

GIOVONTAE O'NEAL JACKSON,

Defendant-Appellant.

UNPUBLISHED
January 14, 2021

No. 350522
Oakland Circuit Court
LC No. 2018-267911-FC

Before: LETICA, P.J., and GLEICHER and O'BRIEN, JJ.

PER CURIAM.

A jury convicted defendant of two counts each of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(e), unlawful imprisonment, MCL 750.349b, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for luring two teenage boys from a park into a residential basement where he sexually assaulted them. Defendant contends that his trial attorneys failed to adequately advise him at the plea-bargaining phase, that the prosecutor improperly commented on his failure "to provide an innocent explanation" for the charged conduct, and that the court improperly admitted statements made by defendant without being adequately advised of his rights. Defendant also challenges the scoring of his sentencing guidelines. These challenges are all without merit. We affirm.

## I. BACKGROUND

One spring evening, 15-year-old CM and 16-year-old MP went to a park to play basketball. Defendant approached and introduced himself as "G," a friend of CM's older brother. Defendant played basketball with the boys and then provided them marijuana. Defendant invited the boys back to his house to smoke more marijuana, play video games, and call girls. At his home, defendant led CM and MP into his basement bedroom. Defendant showed the boys a pistol with a laser-sight attachment and an extended magazine. He then put the gun on his hip.

Defendant left the room and asked CM to follow him. Away from MP, defendant "grabbed" CM and "pulled" him into the bathroom. Once inside, defendant threatened CM, pulled down CM's pants, and performed fellatio on CM against his will. Defendant eventually allowed CM to leave the room and he returned to MP in the bedroom. The boys contemplated escaping,

but defendant came to the bathroom door wearing his gun. Defendant ordered both CM and MP into the bathroom and he forced MP to submit to fellatio as well. Defendant then removed the boys to his bedroom and ordered them to lay down on the bed. Defendant again performed fellatio on the boys. Defendant finally permitted the boys to leave. They ran to a nearby gas station and called MP's mother.

CM's father reported the attack to authorities the following day. Both CM and MP described defendant, indicated that he had an eight-ball tattoo on his forearm, and provided the location of the house where they were assaulted. The boys viewed a facial photographic lineup and an array of photographs depicting eight-ball tattoos on men's forearms. Both CM and MP positively identified defendant's tattooed arm. CM "immediately" selected defendant in the facial photos, but MP was not as certain. During a later search of defendant's home, officers found the weapon described by CM and MP. Forensic analysis of CM's underwear led to DNA from saliva. Defendant was established as a contributor to that sample. Defendant's DNA was also found on the handle of the pistol.

## II. ASSISTANCE OF COUNSEL

Defendant argues that his attorneys were constitutionally ineffective during the plea-bargaining phase for underestimating the sentencing guidelines defendant would face if convicted at trial. Had he realized the true magnitude of the sentence he faced after trial, defendant asserts, he may have accepted the plea offer.

Defendant did not file a motion for a new trial and has not sought remand to do so. In any event, we can adequately review defendant's challenge on the existing record. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). A claim of ineffective assistance of counsel includes two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish that counsel's performance was deficient, a defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). To establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have differed. *Id*. at 663-664.

In the plea-bargaining context, defense counsel is obligated "to properly advise [the] defendant regarding the nature of the charges or the consequences of the guilty plea and the possible defenses to the charges to which the defendant is pleading guilty, so defendant has the ability to make an intelligent and informed choice from among his alternative courses of action." *People v White*, 331 Mich App 144; ___ NW2d ___ (2020) (Docket No. 346901); slip op at 2 (quotation marks and citation omitted).

> When a defendant claims to be prejudiced by rejecting a plea offer based on ineffective assistance of counsel, the defendant must show (1) that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening

circumstances); (2) that the court would have accepted its terms; and (3) that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed. [*Id*., slip op at 3 (quotation marks and citation omitted).]

About five months before trial in this case, defendant's retained attorney, Carl Jordan, filed a motion to withdraw because defendant could not afford his attorney fees. Before Jordan withdrew, he asked the prosecutor to place a plea offer they had discussed on the record. The prosecutor stated that defendant was charged with two counts each of first-degree CSC, unlawful imprisonment, and felony-firearm. He reported that since the preliminary examination, DNA evidence had linked defendant to the crimes. The prosecutor continued:

> [I]n terms of a resolution, I did talk to [Jordan]. And the defendant was originally charged with two counts [of first-degree CSC]; and I did talk to his prior lawyer, Mr. Hatchett, and I advised him that should the defendant wish to plea, that the People would not add any additional charges and that the People would support a *Cobbs*[1] to the bottom of the guidelines. The defendant did not want to take advantage of that. We held the exam. And the defendant now stands charged with the six counts.
>
> Right now, the guidelines, as *potentially* calculated, are about 14[¼] years to 35 years, should he be convicted and should the OVs come out favorable to the People. Now, in terms of a resolution, the People are willing to dismiss all but [the two counts of first-degree CSC], and the *potential* guidelines range could be as low as 10[½] years; and the People would not object to a *Cobbs* to the bottom of the guidelines. [Emphasis added.]

Following a brief, off-the-record conversation with defendant, Jordan stated:

> Your Honor, [defendant] understands everything that was just put on the record regarding the guidelines and the prosecutor's willingness to not object to the low ends being given to [defendant]; however, [defendant] has said to me that it does not make a difference; he would still like to exercise his right to a trial.

Defendant affirmed the accuracy of Jordan's statement.

On the first day of trial, the prosecutor indicated that the plea offer was still open. The trial court stated, "[A]nd so we're clear, the bottom of the guidelines under that offer would be [10½] years?" The prosecutor agreed. The trial court stated that if defendant were convicted at trial, his sentencing guidelines range would be "just over 14 years to 35 years, plus the two [consecutive years for felony-firearm] . . . [s]o that would be looking at 37 years . . . at the top." Defendant was sworn in, and his attorney, Richard Taylor, questioned him as follows:

---

[1] *People v Cobbs*, 443 Mich 276; 505 NW2d 208 (1993).

*Q.* Do you understand that the plea agreement is that you could plead either guilty or no contest to the two counts of [first-degree CSC]? You understand that?

*A.* Yes.

*Q.* And in exchange for that plea, the remaining charges, the [felony-firearm] as well as the unlawful imprisonment charges, those charges will be dismissed?

*A.* I understand.

*Q.* And you understand that if those charges are dismissed, the calculation of your guidelines right now would be, at the bottom end, . . . [10½] years?

*A.* I understand.

*Q.* And if those other charges are included, the minimum of your guidelines will be 14 and (indiscernible)?

*A.* I understand.

*Q.* Understanding that, and that the [c]ourt would enter into a *Cobbs* agreement with you upon a plea for the bottom of the guidelines as relates to the two [first-degree CSC] charges at [10½] years . . . ?

*A.* I understand.

*Q.* And at this date, understanding that and hearing all that, it is your desire that you decline the plea agreement and go to trial?

*A.* Yes, sir.

At sentencing, defendant's sentencing guidelines range was calculated at 18 years, 9 months to 46 years, 10 months. The trial court granted the prosecution's request for a 35-year minimum sentence for the first-degree CSC convictions. The court further sentenced defendant to terms of 10 to 30 years' imprisonment for each unlawful imprisonment conviction, and two consecutive two-year prison terms for the felony-firearm convictions.

Defendant has not established that his attorneys gave him constitutionally deficient advice about the risks of rejecting the prosecution's plea offer. On two occasions, the prosecutor stated that he was willing to dismiss the unlawful imprisonment and felony-firearm charges and that he would not object to minimum sentences of 10½ years for each count of first-degree CSC. On both occasions, the parties estimated that defendant's minimum sentences for CSC-I could be as high as 35 years if he were convicted at trial. And on both occasions, defendant personally affirmed on the record that he knowingly and voluntarily rejected the offer of 10½-year minimum sentences for offenses that could be sentenced as high as 35 years.

Although the parties underestimated defendant's minimum sentencing guidelines range before trial, this did not render any of defendant's attorneys constitutionally deficient. Neither defense counsel nor the prosecutor had the clairvoyance to predict with absolute accuracy how the trial court would score the sentencing guidelines or what sentences the court would ultimately impose. The defense attorneys reasonably relied on the prosecutor's estimate of defendant's likely sentences under the plea-offer and trial-conviction scenarios. And the prosecutor's estimates were not drastically off; the minimum sentencing guidelines range shifted by only one cell.

Even if counsel's performance was deficient, defendant did not establish the necessary prejudice to warrant relief. Defendant maintained his innocence throughout the proceedings, even at sentencing, and he twice rejected a very favorable plea agreement. Defendant has proffered no reasonable explanation for why he would have accepted the plea offer if only his attorneys had predicted his ultimate sentencing guidelines more accurately.

## III. ADMISSION OF POLICE INTERVIEW

Defendant further contends that the trial court improperly admitted into evidence a video recording of his interview with the investigating detective because the detective failed to advise him of his *Miranda*[2] rights first. Our review is limited to plain error affecting defendant's substantial rights as defendant failed to raise a contemporaneous objection or even to seek suppression before trial. See *People v Clark*, 330 Mich App 392, 414; 948 NW2d 604 (2019).

"*Miranda* warnings are not required unless the accused is subject to a custodial interrogation." *People v Steele*, 292 Mich App 308, 316; 806 NW2d 753, 758 (2011). "Generally, a custodial interrogation is a questioning initiated by law enforcement officers after the accused has been taken into custody or otherwise deprived of his or her freedom of action in any significant way." *Id*., citing *Yarborough v Alvarado*, 541 US 652, 661; 124 S Ct 2140; 158 L Ed 2d 938 (2004). "The key question" in determining whether a custodial interrogation took place "is whether the accused could have reasonably believed that he or she was not free to leave." *Id*.

Defendant's May 31, 2018 interview was not a custodial interrogation for Fifth Amendment purposes. The detective asked defendant if he was willing to come to the station and defendant voluntarily appeared. The detective advised defendant multiple times that he was not under arrest, that the door to the interview room was unlocked, and that defendant was free to leave at any time. Defendant repeatedly indicated that he understood. When defendant learned that CM and MP had accused him of sexual assault, defendant actually did end the interview and left. The detective did not try to stop him; in fact, he stated, "That's fine."

Given the nature of this encounter, the detective was not required to advise defendant of his *Miranda* rights or to ensure that defendant waived them. Therefore, the videotape of the May 31, 2018 interview was admissible at trial despite that no such warnings were given. Defendant is not entitled to relief.

---

[2] *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

## IV. PROSECUTORIAL MISCONDUCT

Defendant next argues that the prosecutor impermissibly asked the jury to infer defendant's guilt from his "silence" with the police. Specifically, defendant challenges the prosecutor's comments during closing argument that if there were an "innocent" explanation, defendant would have provided that explanation in his interviews with the police instead of denying all knowledge of the incident.

"The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Avant*, 235 Mich App 499, 508; 597 NW2d 864 (1999). Defendant failed to preserve his challenge by raising a contemporaneous objection to the prosecutor's statements, limiting our review to plain error affecting defendant's substantial rights. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).

At trial, the investigating detective testified that he interviewed defendant on May 31, 2018, and again after the preliminary examination in October 2018. Even after seeing MP and CM at the exam, defendant "denied knowing these kids, never saw them, never heard of them, doesn't know anything about them." No further mention was made of these interviews until closing argument. The prosecutor then argued, "[I]f this was some other innocent situation, if they were just playing basketball and something else went on, other than what the victims told you, certainly the defendant would have told [the detective] that. But the defendant knew what he did." The prosecutor continued by arguing that defendant had a full picture of "what the situation is" by the October interview and "could have then provided a statement to explain his version of what happened." "[W]hy wouldn't he do that, unless he knows he's guilty of what he did," the prosecutor inquired.

The prosecutor's argument did not amount to misconduct. A prosecutor may not comment on a defendant's postarrest, post-*Miranda*-warning silence. *People v Clary*, 494 Mich 260, 271; 833 NW2d 308 (2013). But defendant was not silent. Rather, defendant denied any wrongdoing or acquaintance with the victims. "Where a defendant makes statements to the police after being given *Miranda* warnings, the defendant has not remained silent, and the prosecutor may properly question and comment with regard to the defendant's failure to assert a defense subsequently claimed at trial." *Avant*, 235 Mich App at 509.

Defendant's rights were not so prejudiced in this case. Indeed, in closing arguments, a prosecutor is permitted to argue any reasonable inference from the evidence but may not introduce new or improper evidence. *People v Unger*, 278 Mich App 210, 236, 241; 749 NW2d 272 (2008). As explained earlier, defendant's statements denying any knowledge of the incident in the May 31, 2018 interview were admissible because they were made voluntarily during a noncustodial interview. As defendant raised no objection or appellate challenge to the admission of his October 2018 statements, we presume that defendant was advised of and waived his rights. The prosecutor properly commented on the actual statements made by defendant during those interviews, statements *expressly* denying involvement in the incident. Because defendant's *Miranda* rights either did not apply or were voluntarily waived on the occasions in question, the prosecutor was free to "comment with regard to the defendant's failure to assert a defense subsequently claimed at trial." *Avant*, 235 Mich App at 509.

If the prosecutor made any improper comment in his closing argument, he did so when he asserted that "[m]ost people that are innocent, they'll go in, they'll talk to the police, they'll tell them what happened." That comment was not supported by any evidence in the record. However, this Court "cannot find [plain] error requiring reversal where a curative instruction could have alleviated any prejudicial effect." *Unger*, 278 Mich App at 235 (quotation marks and citation omitted). The trial court clearly instructed the jury that the comments of the attorneys were not evidence and that they "should only accept things that the lawyers say that are supported by the evidence or by your own common sense and general knowledge." "Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements, and jurors are presumed to follow their instructions." *Id*. (citations omitted).

In any event, defendant cannot establish that he was prejudiced by the prosecutor's comments because the evidence strongly indicated his guilt. CM and MP both testified that a man with an 8-ball tattoo on his forearm offered them marijuana and invited them back to his house, where he performed oral sex on them at gunpoint. The police found a 9-milimeter handgun with an extended magazine and a laser-sight, as described by CM and MP, in defendant's basement. DNA analyses revealed that defendant had contributed salivary DNA to stains on the outside and inside of CM's underwear. None of this evidence was meaningfully impeached or rebutted. Accordingly, defendant is not entitled to relief.

## V. SENTENCING GUIDELINES

Defendant finally argues that the trial court erroneously assessed 15 points for OV 8 (victim asportation or captivity) and 15 points OV 10 (exploitation of vulnerable victim). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *Id*.

MCL 777.38(1)(a) provides for the assessment of 15 points for OV 8 when "[a] victim was asported to another place of greater danger or to a situation of greater danger or was held captive beyond the time necessary to commit the offense." Defense counsel asserted that 15 points was insupportable in this case because MP and CM voluntarily accompanied defendant into his basement. Although MP and CM agreed to accompany defendant, defendant lured the boys from a public park to a secluded basement on false pretenses. Accepting defendant's argument as true would forgive predators for luring children into vans with candy; this was not the Legislature's intent. Defendant gained the trust of MP and CM through a pretended connection. He impaired their faculties with marijuana. And then he lured the boys to his basement abode with promises of marijuana, video games, and girls. Assessing points under OV 8 is warranted whenever a defendant removes a victim to a place where a sexual assault is less likely to be discovered and interrupted. *People v Barrera*, 500 Mich 14, 21-22; 892 NW2d 789 (2017). Defendant asported his victims by subterfuge, and a 15-point score for OV 8 was warranted.

MCL 777.40 provides for the assessment of points for "exploitation of a vulnerable victim." MCL 777.40(1) requires the assessment of 15 points for "[p]redatory conduct," and 10 points when "[t]he offender exploited a victim's physical disability, mental disability, youth or

-7-

agedness, or a domestic relationship, or the offender abused his or her authority status." The court assessed 15 points in this case, but defendant asserts that only 10 points were warranted. However, the record supports that defendant engaged in "[p]redatory conduct," i.e., "preoffense conduct directed at a victim . . . for the primary purpose of victimization." MCL 777.40(3)(a). "Predatory conduct" for purposes of OV 10 has also been defined as "behavior that precedes the offense, directed at a person for the primary purpose of causing that person to suffer from an injurious action or to be deceived." *People v Cannon*, 481 Mich 152, 161; 749 NW2d 257 (2008). In illustration of those elements, our Supreme Court cited a case in which the defendant invited a victim to accompany him to a store but instead forced her to smoke marijuana for two hours before taking her to an unfamiliar house and sexually assaulting her. *Id*. at 263. Our Supreme Court stated, "Clearly, the preoffense conduct of driving the victim around while forcing her to smoke marijuana was undertaken to make the victim an easier target for the sexual assault. Thus, it was done for the primary purpose of victimization." *Id*.

Defendant's conduct in this case resembles the case cited in *Cannon*. Defendant sought out teenage boys at a local park. He tricked the boys into believing he was a family friend and gave them marijuana to intoxicate them and make them easier targets. Defendant gave the boys a false excuse to accompany him: a friendly evening of playing video games, calling girls, and smoking marijuana. He did this to get the boys alone in a basement where he could sexually assault them without interruption and with little chance of escape. The court's assessment of 15 points was more than adequately supported.

We affirm.

/s/ Anica Letica
/s/ Elizabeth L. Gleicher
/s/ Colleen A. O'Brien